AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

<table>
<tr><td>

**LODGED**
CLERK, U.S. DISTRICT COURT

**11/09/2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

</td></tr>
</table>

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>Saeed Najah Ghazi,<br>Khalid Jarrah,<br>Victor Thomas Diaz III, and<br>Patrick Lee Sousa,<br><br>        Defendants | Case No.   5:20-mj-00594 |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

        I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning not later than on or about October 3, 2019, and continuing through the present, in the counties of

Riverside and Los Angeles in the Central District of California, the defendants violated:

|  *Code Section* |  *Offense Description* |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |

        This criminal complaint is based on these facts:

        *Please see attached affidavit.*

        ☒ Continued on the attached sheet.

_____
/s/ signed pursuant to Fed. R. Crim. P. 4.1
*Complainant's signature*

_____
N.T. Elias, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   November 9, 2020

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, N.T. Elias, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal
complaint against and arrest warrants for **SAEED NAJAH GHAZI**
(**"GHAZI"**), **KHALID JARRAH** ("**JARRAH**"), **VICTOR THOMAS DIAZ III**
("**DIAZ**"), and **PATRICK LEE SOUSA** ("**SOUSA**"), for a violation of
18 U.S.C. § 371 (Conspiracy to Engage in the Business of
Manufacturing Firearms and the Business of Dealing Firearms in
violation of 18 U.S.C. § 922(a)).

2.     The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrants and does not purport
to set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only, and all dates and times
are approximate.

## II. BACKGROUND OF AFFIANT

3.     I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since 2005.
Prior to being employed with the FBI, I was employed from July
of 1998 through January of 2005 with the Washington State
Patrol, first as a Trooper and then as a Detective.  With the
FBI, I have worked investigations involving organized crime,

1

kidnapping, fugitives, bank robbery, drug trafficking, extortion, fraud, and terrorism. My current assignment with the FBI is in the Los Angeles Field Office, Riverside Resident Agency, assigned to the Joint Terrorism Task Force ("JTTF"). Since November of 2009, I have been assigned to investigate international terrorism. I have received specialized training in terrorism and weapons of mass destruction and have participated in the investigation and prosecution of individuals who have been charged with violent crimes and terrorism.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

4.  As detailed below, between at least October 2019 and the present, **GHAZI, JARRAH, DIAZ**, and **SOUSA** (collectively, the "co-conspirators"), as well as other associates, have run an illegal firearms business without the required licenses. **GHAZI** obtains firearms parts from various sellers in the United States and then unlawfully exports firearm parts to Lebanon without the required export licenses. **GHAZI, JARRAH**, and **DIAZ** also use firearm parts to manufacture firearms that they provide to **SOUSA** and others to sell to customers in Riverside. **GHAZI, JARRAH, DIAZ**, and **SOUSA** have not obtained licenses to export firearm parts overseas or to manufacture or deal firearms in the United States.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

A.  **Background on the Co-Conspirators and Statutes**

1.  <u>The Co-Conspirators</u>

5.  According to Homeland Security Investigations ("HSI") records, **GHAZI** was born in Lebanon in 1988 and immigrated to the

United States in 2008.  According to California Department of
Motor Vehicles ("DMV") records, **GHAZI** previously resided in
Inglewood and now resides in Riverside, California.  **GHAZI** has
no criminal history and is currently a member of the Inactive
Ready Reserves with the United States Army.

    6.  According to Customs and Border Protection ("CBP")
records, **JARRAH** is a 31-year-old citizen of Lebanon who arrived
at Los Angeles International Airport ("LAX") on October 16,
2020.  During a border inspection, **JARRAH** told a CBP officer
that he was in the United States to visit **GHAZI** and identified
**GHAZI's** brother's residence in Inglewood as the address where he
would be staying while in the United States.  In fact, however,
as detailed below, since his arrival **JARRAH** has resided with
**GHAZI** at the business complex in Riverside where they conduct
the illegal firearms business.

    7.  According to law enforcement databases and California
Department of Motor Vehicles ("DMV") records, **DIAZ** is a 32-year-
old United States citizen and resident of Riverside, California.
**DIAZ** is currently wanted on a felony warrant in San Bernardino
County California for assault with a deadly weapon and also has
two outstanding misdemeanor warrants for driving under the
influence of drugs and possession of a controlled substance.

    8.  According to law enforcement databases and DMV
records, **SOUSA** is a 40-year-old United States citizen and
resident of Riverside, California.  SOUSA has sustained felony
convictions for second degree robbery involving a firearm and
robbery.

2.    The Applicable Statutes

9.    Title 18, United States Code, Section 922(a) provides,
in relevant part:  "It shall be unlawful . . . for any person .
. . except a licensed importer, licensed manufacturer, or
licensed dealer, to engage in the business of importing,
manufacturing, or dealing in firearms, or in the course of such
business to ship, transport, or receive any firearm in
interstate or foreign commerce."

10.   A "manufacturer" is defined as "any person engaged in
the business of manufacturing firearms or ammunition for
purposes of sale or distribution."  18 U.S.C. § 921(a)(10).

11.   A "dealer" is defined as "(A) any person engaged in
the business of selling firearms at wholesale or retail, (B) any
person engaged in the business of repairing firearms or of
making or fitting special barrels, stocks, or trigger mechanisms
to firearms, or (C) any person who is a pawnbroker."  18 U.S.C.
§ 921(a)(11).

12.   A "firearm" is defined as "(A) any weapon (including a
starter gun) which will or is designed to or may readily be
converted to expel a projectile by the action of an explosive;
(B) the frame or receiver of any such weapon; (C) any firearm
muffler or firearm silencer; or (D) any destructive device.
Such term does not include an antique firearm."  18 U.S.C.
§ 921(a)(3).

13.   "Engaged in the business" is defined, as applied to a
manufacturer of firearms, as "a person who devotes time,
attention, and labor to manufacturing firearms as a regular

4

course of trade or business with the principal objective of
livelihood and profit through the sale or distribution of the
firearms manufactured."  18 U.S.C. § 921(a)(21)(A).

14.   "Engaged in the business" is defined, as applied to a
dealer in firearms defined in section 921(a)(11)(A), as "a
person who devotes time, attention, and labor to dealing in
firearms as a regular course of trade or business with the
principal objective of livelihood and profit through the
repetitive purchase and resale of firearms, but such term shall
not include a person who makes occasional sales, exchanges, or
purchases of firearms for the enhancement of a personal
collection or for a hobby, or who sells all or part of his
personal collection of firearms."  18 U.S.C. § 921(a)(21)(B).

15.   "Engaged in the business" is defined, as applied to a
dealer in firearms defined in section 921(a)(11)(B), as "a
person who devotes time, attention, and labor to engaging in
such activity as a regular course of trade or business with the
principal objective of livelihood and profit, but such term
shall not include a person who makes occasional repairs of
firearms, or who occasionally fits special barrels, stocks, or
trigger mechanisms to firearms."  18 U.S.C. § 921(a)(21)(D).

**B.   November 2019: GHAZI Attempted to Ship Export-
     Controlled Firearm Parts to Lebanon without the
     Required License**

16.   According to Department of Homeland Security records,
on November 11, 2019, a DHL International[1] shipment facility in

---

[1] DHL International is a German-based international express
parcel shipping service.

Ontario, California, received a package with a listed destination address of "Najah Ghazi" in Chtaura, Lebanon, and a listed sender of "Lana Autosales," "Saeed Ghazi," at an address in Inglewood, California (the "Inglewood Property"), with telephone number, XXX-XXX-3396 (the "3396 Number").  The Shipper's Export Declaration submitted to DHL along with the package listed the contents as "wheeled toys, dolls, other toys, scale models, etc" with a value of $28.

17.  HSI special agents conducted an outbound inspection of the package and found inside 14 lower receivers sold by a U.S.-based company that manufactures and sells firearm components and firearm manufacturing kits ("Supplier #1"), as well as 20 pistol magazines.  According to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") website, a lower receiver is the "part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

18.  According to California Secretary of State records, "Lana AutoSales LLC" filed Articles of Organization on April 15, 2019 and listed its address as the Inglewood Property.  The Articles of Organization list the type of business as "auto sales," and list **GHAZI** as the manager.  **GHAZI** is the sole individual identified in the Articles of Organization.

19.  According to T-Mobile records, as of August 10, 2020, the 3396 Number is subscribed to a woman identified as **GHAZI**'s sister-in-law, at the Inglewood Property.

20.   According to Wells Fargo Bank ("Wells Fargo") records, **GHAZI** owns or controls three Wells Fargo bank accounts: (1) a business checking account with an account number ending in 9704, registered to Saeed Ghazi, Doing Business As ("DBA") Lana Autosales; (2) A savings account with an account number ending in 8457, registered to Saeed Ghazi; and (3) a checking account with an account number ending in 1577, jointly registered to **GHAZI** and a woman, S.D., who according to information provided by HSI special agents is **GHAZI's** mother.  The mailing address for all three accounts is the Inglewood Property.

21.  Wells Fargo records show that **GHAZI** made the following purchases from the account ending in 9704 in the five weeks leading up to his attempted export of firearms parts to Lebanon on November 11, 2019:

| DATE | RETAIL | AMOUNT |
|------------|---------------|------------|
| 10/3/2019 | "Supplier #2" | $330.00 |
| 10/15/2019 | "Supplier #3" | $799.99 |
| 10/15/2019 | "Supplier #4" | $85.00 |
| 10/18/2019 | "Supplier #3" | $2,815.36 |
| 10/22/2019 | "Supplier #3" | $1,177.96 |
| 10/30/2019 | "Supplier #5" | $230.59 |
| 11/4/2019 | "Supplier #3" | $792.30 |
| 11/6/2019 | "Supplier #2" | $918.00 |
| 11/8/2019 | "Supplier #3" | $1,206.99 |
| 11/12/2019 | "Supplier #2" | $576.50 |

22.  According to basic Internet research, Supplier #2, Supplier #3, Supplier #4, and Supplier #5 are retailers located throughout the United States that sell firearms and firearm parts, including over the Internet.

23.   According to records obtained from Supplier #2, Supplier #3, and Supplier #5, **GHAZI** purchased numerous firearm-parts, such as pistol frames, slides, and barrels, as well as firearm magazines, from each of those companies between October 10, 2019 and November 6, 2019 and listed the Inglewood Property as the shipping address.

24.   According to HSI records, on December 30, 2019, HSI special agents visited the Inglewood Property and knocked on the door.  A man later identified as **GHAZI's** brother, A.G., answered the door.[2]  A.G. initially denied knowing **GHAZI**.  Agents then showed A.G. a picture of **GHAZI**, and A.G. said he did not know him.  Agents then said that A.G. looked like he could be the person in the picture, at which point A.G. said the person in the picture was his brother, **GHAZI**, and that **GHAZI** lived in Riverside.

25.   According to HSI records, on February 24, 2020, HSI special agents visited a commercial building on Magnolia Avenue in Riverside, California (the "Magnolia Property"), where Lana AutoSales' public Facebook page listed one of the business suites as its address.  Agents contacted **GHAZI** and **GHAZI** agreed to participate in a voluntary interview.  HSI special agents asked **GHAZI** about the package seized in November 2019.  **GHAZI** said he had received a notice from United States Customs and Border Protection ("CBP") regarding the seizure, and that he intended to petition CBP to return the contents because he had

_____

[2] According to DMV records, Ahmad's listed residence is the Inglewood Property.

8

paid a lot of money for them.  **GHAZI** said that he believed that lower receivers, like the ones in the package, were not considered firearms and were not subject to export controls. **GHAZI** said he had removed the springs out of the magazines before shipping them in order to render them inoperable.  **GHAZI** said he intended to ship the package to his father in Lebanon. When the special agents asked **GHAZI** when he had last traveled to Lebanon, **GHAZI** said he could not remember.  Agents informed **GHAZI** that records showed he had traveled to Lebanon a couple of days after the package was sent in November 2019.  **GHAZI** responded that he had not traveled to Lebanon recently and then requested to speak to an attorney.

26.  According to travel records, **GHAZI** flew from Los Angeles to Lebanon on November 13, 2019 – two days after he attempted to export firearm parts to Lebanon – and returned to LAX on November 19, 2019.  Wells Fargo records show that **GHAZI** made a purchase from United Airlines on November 5, 2019 (likely the airline ticket to Lebanon), and made a purchase at the "Beirut Duty Free D Airport Lbn" on November 18, 2019, which I believe to be at the airport in Lebanon.  Furthermore, Instagram records show that **GHAZI's** Instagram account was accessed from an Internet Protocol ("IP") address in Lebanon on November 18, 2019.

27.  According to HSI records, in December 2019, an HSI Forensics Laboratory examined the contents of the parcel for fingerprints.  Fingerprint analysis revealed a positive match inside the parcel for an associate of **GHAZI's,** M.M.

28.   According to HSI records, on May 2, 2020, M.M. entered the United States from Mexico.  During a border inspection, M.M. reported his address as an address in Inglewood that is the downstairs unit of a multi-unit building, directly beneath the Inglewood Property.  CBP officers obtained M.M.'s cell phone number, XXX-XXX-6043.

29.   According to T-Mobile records, between February 28, 2019 and April 7, 2020, **GHAZI** and M.M.'s cell phone numbers exchanged 119 text messages and 17 phone calls, including numerous text messages on November 8 and 15, 2019, around the time when **GHAZI** attempted to export to Lebanon the package of firearms parts containing M.M.'s fingerprints.

30.   According to Wells Fargo records, on November 8, 2019, GHAZI sent M.M. $150 via Zelle, an electronic funds transfer service.  According to Zelle records, GHAZI also sent payments to an account in the name of C.M., who shares the same last name as M.M., in February, April, August, and September 2020.  Based on my review of the Wells Fargo records and Zelle records, I believe that the account that Zelle records identify by the name C.M. is the same account that Wells Fargo records identify by the name M.M. and that the payments reflected in Zelle records to C.M. are payments from GHAZI to M.M. for M.M.'s assistance in firearms trafficking activity.

**C.   August-September 2020: Surveillance Video Showed the Co-Conspirators Discussing Manufacturing and Dealing Firearms at the Magnolia Property**

31.   The Magnolia Property contains several office suites that are connected by a shared public hallway and use a shared

10

conference room.  **GHAZI** uses multiple office suites at the property.  One of the tenants at the Magnolia Property maintains a surveillance system outside of the tenant's suite, which records the entry to the tenant's suite in the public common area.  Beginning in August 2020, that tenant voluntarily provided the FBI recordings from the video camera surveillance system.[3]  Several of those recordings show **GHAZI** and other co-conspirators discussing and engaging in activities related to obtaining, manufacturing, and selling firearms and firearm parts, including the following, specifically:

a.   On August 27, 2020, the camera recorded **GHAZI** in the hallway making various statements to an associate about **GHAZI**'s ability to obtain and sell firearms, including: (1) "I have the rifle one;" (2) "I have more coming;" (3) "Like Maybe two weeks;" (4) "I can get the smaller ones and the bigger ones;" (5) "Wait 'til we get them;" and (6) "I can get as much Glocks as you want."

b.   The night of September 2, 2020, the camera recorded **SOUSA, DIAZ,** and a third associate at the Magnolia Property.  The third associate described to **SOUSA** how he placed his firearm in an overhead area, "I was like . . . put my gun in there."  Later, the camera showed **DIAZ** emerge from the area of

---

[3]  ████████████████████████████████████████

**GHAZI**'s office suites and hand the third associate a cellular phone.

       c.   On September 7, 2020, the camera recorded **DIAZ** carrying a ladder from the shared conference room toward **GHAZI's** office suites and later returning the ladder to the conference room.

       d.   On September 8, 2020, the camera recorded **GHAZI** entering the conference room with another associate who was carrying an orange power cord and an unidentifiable item in his hand that appears to be a tool.  A separate video on the same date showed **DIAZ** carrying a ladder back to the conference room from the vicinity of **GHAZI's** office suites.

       e.   On September 14, 2020, the camera recorded **GHAZI** discussing his firearms business with the property manager at the Magnolia Property.  **GHAZI** discussed, using coded language, his efforts to obtain more office space to continue his firearms business and said that he was aware that others knew he was trafficking firearms and wanted to obtain a different office space to conceal his activities.

       f.   On October 11, 2020, the camera recorded **GHAZI** exiting the conference room at the Magnolia Property carrying a corded power tool consistent with the size and shape of a hand-held grinder tool.

   32.  On September 9, 2020, **GHAZI** submitted an application for a Federal Firearms License ("FFL").  On his application, **GHAZI** identified his business as "GLOCK 80 LLC".  **GHAZI** listed himself as the "responsible person," listed one of his office

suites at the Magnolia Property as the business address, and listed the Inglewood Property as his current residence and billing address.  According to the website for Glock 80 LLC, www.glock80.com, the website advertises pistol kits from Supplier #1 and states that customers can purchase a "buy, build, shoot kit," which can be assembled in "10 minutes."  The website states that by purchasing kits from Glock 80 LLC, customers can obtain firearms with "no background check, no wait time, no trace."[4]  As of November 4, 2020, ATF records show that **GHAZI**'s application has not been granted and **GHAZI** has not obtained an FFL.

> **D.   September-October 2020: Co-Conspirators Described Illegal Firearms Business and Sold Firearms to FBI Confidential Human Sources**
>
>   1.   September 5 through October 6, 2020: CHS Met **GHAZI** and Observed **GHAZI** and **DIAZ** Manufacturing Firearms

33.  On September 5, 2020, according to reporting from an FBI Confidential Human Source ("CHS-1"), CHS-1 walked into one of **GHAZI's** office suites at the Magnolia Property and saw **GHAZI**.[5] **GHAZI** told CHS-1 that **GHAZI**'s main business is selling cars.

---

[4] Based on my training and experience, I know that certain states, including California, require registration of firearm purchases and waiting periods before a person can buy a firearm, and this advertisement appears to be offering individuals a way to circumvent those laws by purchasing a kit with firearm parts rather than completed firearms.

[5] CHS-1 has been reporting to the FBI since approximately 2007.  CHS-1 was previously convicted of drug trafficking and sentenced to three-and-a-half years in federal prison.  Due to CHS-1's work as a CHS, as of October 2020, CHS-1 has been paid over $450,000 in payments from the government and received immigration benefits, including being permitted to remain in the United States despite CHS-1's felony conviction.

While inside, CHS-1 saw several firearm magazines and one completed firearm on the desk, as well as additional firearm holsters on a mini-refrigerator behind the desk.

34.  On October 6, 2020, CHS-1 again met with **GHAZI** at the Magnolia Property.  According to CHS-1, CHS-1 knocked on the partially open door of one of **GHAZI's** office suites after seeing **GHAZI** inside with **DIAZ**, and then entered.  Inside, CHS-1 saw **GHAZI** and **DIAZ** working on metal objects that looked like the slide, barrel, and spring components of a pistol.  CHS-1 also saw a grinder tool in the room.  Based on my training and experience, I know that the types of firearms parts that **GHAZI** purchases require milling of the lower receiver to allow the receiver to accept a trigger assembly and barrel.  I have examined firearms recovered by Riverside Police Department built from Supplier #1's lower receivers, like those **GHAZI** uses, and saw that the insides of the lower receivers were milled with a small device such as a drill or a rotary[6] tool.  Accordingly, I believe that **GHAZI** is likely using the grinder that CHS-1 saw to mill lower receivers to create fully functioning firearms.

> 2.  <u>October 14, 2020: **GHAZI** Described Illegal Operation to CHS-1 and Called His Firearm Supplier and Customer</u>

35.  On October 14, 2020, CHS-1 again met with **GHAZI** at the Magnolia Property and then traveled with **GHAZI** in a vehicle to a business establishment and also a restaurant, both located in Orange County, California.  CHS-1 wore a concealed audio

---

[6] A rotary tool allows a user to make precision cuts, polish, grind, and drill items.

recording device.  According to the recording and a preliminary translation of the portions of the conversations conducted in Arabic, **GHAZI** discussed his firearm business with CHS-1, including the following:

a.   **GHAZI** told CHS-1 he regularly exports firearms components to Lebanon, and makes a profit of $1,300 per set. **GHAZI** described to CHS-1 how he conceals the firearm parts among other items, and then ships the parts to Lebanon where an associate assembles them into functioning firearms.  **GHAZI** said that one of his shipments had been intercepted (presumably referring to the November 2019 shipment discussed above) and said that seizure had cost him 22 firearms, at a retail value of $98,000.

b.   **GHAZI** told CHS-1 he works with an associate to convert semi-automatic firearms into fully automatic firearms, which he sells for a profit of $200 to $250.  **GHAZI** also showed CHS-1 a video on his phone of **GHAZI** firing a fully automatic pistol while seated in his car at an unidentified location in the desert.

c.   **GHAZI** told CHS-1 that he was seeking to open a firearms store and obtain a license that would provide a legitimate front for his business.

d.   **GHAZI** said his friend and business partner was planning to come from Lebanon on October 16, 2020.  As detailed below, I believe this friend is **JARRAH**.

36.  According to CHS-1, while at the Magnolia Property on October 14, 2020, CHS-1 observed **DIAZ** in one of **GHAZI's** office

15

suites working on pistols.  CHS-1 observed tools including saws, drills, welders, and a vice.

37.  Based on my review of the audio recording, during the meeting, **GHAZI** made multiple phone calls with associates, including the following two successive calls, which were in English:

a.  First, **GHAZI** placed a phone call to an individual who appears to be a firearm customer and discussed obtaining and selling firearms, and converting firearms to be fully automatic, stating:

> . . . going to call my guy right now.  I've sold already 40 of the coming ones.  How many you need?  Ten?  Listen, are you sure you are going to buy it?  You gotta pay cash right away. Alright. . . .  I'll call my guy right now.  Do you want any AR?  How many?  There's five as well.  Alright, I'll give you, do you, are you any automatic conversion?  You know what I am talking about right?  Alright.  I'm gonna have to call my guy and check when they will come.  When am I gonna get my $200?  Just send me Zelley. Zelle.  Send me cash or stop by the office.

b.  Shortly after that call, **GHAZI** conducted another phone call in the presence of CHS-1.  According to T-Mobile records, at a time corresponding to the CHS recording, **GHAZI** placed a phone call to XXX-XXX-0471, which is listed on the website for Supplier #1 as its contact phone number.  Based on the context of the conversation and my knowledge of the investigation, I believe this phone call was with Z.S., who is, according to basic internet research, a representative of

Supplier #1, **GHAZI's** firearm-parts supplier.  During the call, GHAZI stated:

> Hey [Z] . . .  I got your text message saying you are going to be shipping tomorrow.  Ok.  How many?  Alright, cool. So I have about 45 already sold, of the coming ones, I hope, I believe.  5500 . . . no.  Yes.  Cause the 20 I receive, I not even get the 5 ARs. . . .  Make sure to keep me at 75 a month.  Alright.  Ya, I got 75 a month, right? . . . Let me do the payments, send advance . . . wire money.  I'll wire it. . . .  Cool.  Give me a ring tomorrow. Just give me an update when you are going to ship out.

Based on my training and experience and knowledge of this investigation, I believe **GHAZI** was confirming that Supplier #1 would send him firearm parts the next day, that his reference to "45 already sold" means he had already sold 45 firearms, and that his reference to "keep me at 75 a month" means he was receiving 75 firearm kits from Supplier #1 each month in order to sell firearms to customers, including the customer with whom **GHAZI** had just spoken.

> 3. October 16-17, 2020: **JARRAH** Arrived and Helped **GHAZI** Manufacture Firearms

38.  According to CBP records, on October 16, 2020, **JARRAH** arrived at LAX on a flight from Lebanon.  According to surveillance, **JARRAH** exited the Tom Bradley International Terminal at LAX and was picked up by **GHAZI**.  Later that day, surveillance personnel saw **GHAZI**'s car parked in the driveway for the Inglewood Property.  Later that night, surveillance

personnel saw **JARRAH**, **GHAZI**, and **GHAZI**'s girlfriend arrive at a restaurant in Riverside near the Magnolia Property.

39.  On the evening of October 16, 2020, the video camera surveillance system at the Magnolia Property recorded **GHAZI**, **JARRAH**, and **GHAZI**'s girlfriend arrive carrying multiple large bags, as well as **JARRAH's** luggage.

40.  On October 17, 2020, the camera recorded **JARRAH** working inside the Magnolia Property, carrying a vacuum cleaner, taking out trash, moving a ladder inside, and carrying unknown items out of the Magnolia Property.

### 4.   October 20-21, 2020: **GHAZI** and **JARRAH** Manufactured Firearms

41.  On October 20 and 21, 2020, CHS-1 met with **GHAZI** and **JARRAH** at the Magnolia Property.[7]  According to CHS-1, during the October 20, 2020, meeting CHS-1 asked **GHAZI** how the firearms business would continue to operate in Lebanon while **JARRAH** was in the United States.  **GHAZI** told CHS-1 that the business could continue because he had other people working with him in Lebanon.  **GHAZI** told CHS-1 that he was preparing to sell 45 firearms to a customer in the following week.  **GHAZI** invited CHS-1 to become a silent partner in the business.  According to CHS-1, GHAZI proposed that CHS-1 provide cash as capital to invest in a new store for the business and in exchange CHS-1 would receive a share of the profits.

_____

[7] CHS-1 wore a concealed audio recording device throughout these meetings, however the vast majority of the meetings were conducted in Arabic and that recording has not yet been translated.  Therefore, the facts set forth below regarding these meetings are based on information provided by CHS-1 shortly after the meetings concluded.

42.  According to CHS-1, during the October 21, 2020 meeting, CHS-1 saw **JARRAH** seated at a desk in one of **GHAZI's** office suites at the Magnolia Property working on a disassembled pistol.  On the desk were three fully assembled pistols.  CHS-1 saw **JARRAH** use a grinder to mill a lower receiver for a pistol and assemble the trigger mechanism and firing pin.  CHS-1 saw **JARRAH** using a hand-held tool, pliers, and a rubber hammer to assemble a pistol.  According to CHS-1, **JARRAH** said he had assembled firearms many times in Lebanon.  **GHAZI** offered to explain to CHS-1 how he and **JARRAH** manufacture firearms.

     5.   <u>October 27, 2020: **GHAZI** Met with CHS-1 to Discuss the Firearms Business</u>

43.  On October 27, 2020, CHS-1 met with **GHAZI** in one of **GHAZI's** office suites at the Magnolia Property.[8]  According to CHS-1, CHS-1 told **GHAZI** that CHS-1 had a partner who was also interested in participating as a silent partner in **GHAZI's** firearms business.  **GHAZI** said that his profit margin is 25 to 30 percent on "legal" firearms sales, apparently referring to sales of unassembled "buy, build, shoot" kits.  **GHAZI** said that his profit margin is 100 percent on illegal firearms sales, apparently referring to sales of completed firearms.  **GHAZI** said he purchases the parts for a single firearm for $375 and sells each completed illegal firearm for $700.  CHS-1 told **GHAZI** that

---

[8] CHS-1 wore a concealed audio recording device throughout the meeting, however the vast majority of the meeting was conducted in Arabic and that recording has not yet been translated.  Therefore, the facts set forth below regarding the meeting are based on information provided by CHS-1 shortly after the meeting concluded.

CHS-2 would be in town on October 29, 2020 and wanted to meet with **GHAZI**.

6.   October 29, 2020: **GHAZI** Agreed to Sell CHS-2 a Firearm

44.   On October 29, 2020, CHS-1 met again with **GHAZI** and **JARRAH** in one of **GHAZI's** office suites at the Magnolia Property. For this meeting, CHS-1 was accompanied by two individuals whom **GHAZI** and **JARRAH** believed were potential partners for their illegal firearms business, but who were in fact Confidential Human Sources working for the FBI ("CHS-2" and "CHS-3").[9]  **GHAZI** and **JARRAH** went with CHS-1, CHS-2, and CHS-3 to a restaurant in Orange County and then back to the Magnolia Property.  According to CHS-2, during the meeting, **GHAZI** said he was interested in opening a firearms store to conduct legal firearms sales out of the front, and illegal firearms sales out of the back.[10]  **GHAZI** asked CHS-2 to join the business as a silent partner.  **GHAZI** proposed that he, CHS-1, and CHS-2 be equal partners, dividing costs and profits in thirds.

45.   According to CHS-2, during the meeting**, GHAZI** told CHS-2 he manufactures and sells approximately 75 completed

---

[9] CHS-2 has been reporting to the FBI since approximately 1996.  As of October 2020, CHS-2 has been paid over $4,100 in payments from the government.

CHS-3 has been reporting to the FBI since approximately 2011.  As of October 2020, CHS-3 has been paid over $840,000 in payments from the government.

[10] The CHSs wore concealed audio recording devices throughout the meeting, however the vast majority of the meeting was conducted in Arabic and the recordings have not yet been translated.  Therefore, the facts set forth below regarding the meeting are based on information provided by CHS-2 shortly after the meeting concluded, which CHS-1 and CHS-3 contemporaneously affirmed.

firearms per month, and also sells firearm parts to out-of-state buyers.  **GHAZI** showed CHS-2 an invoice for "57 guns" purchased by "Glock 80" for approximately $20,800.  **GHAZI** demonstrated how he mills pistol frames from Supplier #1 to manufacture completed firearms.  **GHAZI** also showed CHS-2 the metal piece he uses to convert pistols into fully automatic firearms.  **GHAZI** said he also buys parts for AR-15 style rifles and can make those rifles fully automatic.  **JARRAH** told CHS-2 that he can build three pistols in one hour.

46.  During the meeting, FBI special agents monitoring the concealed audio recording device worn by CHS-2 and heard **GHAZI** call an individual and ask that the individual bring him a firearm to show CHS-2.  Shortly thereafter, surveillance personnel at **DIAZ's** residence in Riverside saw a black Toyota Prius arrive at the residence, stay for a short time, and then drive to the Magnolia Property.

47.  According to CHS-2, **DIAZ** arrived at the Magnolia Property followed shortly by **SOUSA.**  **GHAZI** asked **DIAZ** if he had brought a firearm as instructed to show CHS-2.  **DIAZ** said he did not bring a firearm.  At **GHAZI's** request, **SOUSA** removed a pistol from his waistband and unloaded it.  **GHAZI** used **SOUSA's** pistol to demonstrate to CHS-2 how he manufactures firearms.  At the direction of the FBI, CHS-2 asked **GHAZI** if **GHAZI** would sell CHS-2 a pistol, and **GHAZI** agreed to sell CHS-2 a pistol the following day.

7.   October 30, 2020: **GHAZI** Explained the Firearms
Business to the CHSs and Sold Firearms to CHS-2

48.   On October 30, 2020, CHS-1, CHS-2, and CHS-3 arrived at the Magnolia Property and met with **JARRAH**.[11]  According to CHS-2, **GHAZI** was not present and **JARRAH** said that **GHAZI** had not yet finished building the pistol for CHS-2.

49.   Later that evening, the CHSs, **JARRAH,** and **GHAZI** ate dinner together at a restaurant in Orange County.  According to CHS-2, they discussed the firearms business, and **GHAZI** said he expected to receive parts to build more pistols in the coming week to manufacture firearms, and that the firearms would be provided to **GHAZI's** distributors, including **SOUSA**.  **GHAZI** told CHS-2 that **SOUSA** generally buys 40 firearms at a time.  **GHAZI** told CHS-2 that **JARRAH** and **DIAZ** help him build the firearms and they planned to continue manufacturing firearms once he established a legitimate store front.

50.   During the meeting at the restaurant, at the direction of the FBI, CHS-2 asked **GHAZI** to sell CHS-2 15 pistols and a fully automatic AR-15 rifle.  **GHAZI** responded that, although fully automatic rifles were illegal to possess he would sell CHS-2 a fully automatic rifle.

---

[11] The CHSs wore concealed audio recording devices throughout the meeting, however the vast majority of the meeting was conducted in Arabic and the recordings have not yet been translated.  Therefore, the facts set forth below regarding the meeting are based on information provided by CHS-2 shortly after the meeting concluded, which CHS-1 and CHS-3 contemporaneously affirmed.

51.   The group left the restaurant and drove back to the Magnolia Property.  CHS-2 rode with **GHAZI** in **GHAZI's** car. During the drive, CHS-2 and GHAZI discussed exporting firearms parts to the Middle East.  **GHAZI** told CHS-2 he uses DHL to ship firearms parts to Lebanon and uses a fake identification and business address in furtherance of the shipping.  **GHAZI** said **DIAZ** used to work for DHL and was familiar with DHL's system. CHS-2 told **GHAZI** that CHS-2 was interested in exporting firearm parts to the Middle East.  **GHAZI** advised CHS-2 to ship firearm parts in separate batches rather than all at once and to use a false identification when shipping the parts.

52.   **GHAZI** told CHS-2 that **GHAZI** sells pistols to **SOUSA** for $600 each and **SOUSA** sells the firearms and makes an additional $150 to $200 for each firearm.  **GHAZI** offered to sell pistols to CHS-2 at a discounted rate of $500 each.  **GHAZI** agreed to build and sell to CHS-2 a fully automatic 10.5 inch barrel AR-15 rifle, a semi-automatic AR-15 rifle, and approximately 10 pistols.  After they returned to the Magnolia Property, **GHAZI** accepted $1,000 cash from CHS-2 ($500 for one pistol and $500 as a deposit for additional pistols **GHAZI** would deliver later).

        8.   <u>October 31, 2020: **GHAZI** and **JARRAH** Met with CHSs</u> <u>and **SOUSA** Provided a Pistol to CHS-2</u>

53.   On October 31, 2020, CHS-1 and CHS-2 met with **GHAZI** and **JARRAH** in one of **GHAZI's** office suites at the Magnolia Property.[12]  According to CHS-2, when they arrived, **GHAZI** was in

---

[12] CHS-1 and CHS-2 wore concealed audio recording devices throughout the meeting, however the vast majority of the meeting

the process of manufacturing a pistol.  The group left to eat
lunch at a restaurant and then returned to the Magnolia
Property.  During the meeting, **GHAZI** showed CHS-2 a list of the
distributors to whom he sold firearms.  According to CHS-2, the
list showed one distributor (**SOUSA**) to whom he sold 40 pistols
per month, two who purchased 15 pistols per month, and one who
purchased 10 pistols per month.

54.  **GHAZI** told CHS-2 that, due to demand from his other
distributors, he might only be able to provide CHS-2 eight to
ten pistols.  **GHAZI** told CHS-2 that the pistol CHS-2 had
requested and paid $500 for the previous day was not ready yet,
and therefore **GHAZI** would credit the $500 toward the purchase of
the eight to ten pistols.

55.  At the direction of the FBI, CHS-2 paid **GHAZI** $1,100
in cash for the two rifles that **GHAZI** had agreed to sell CHS-2
on October 30, 2020 (a fully automatic AR-15 and a semi-
automatic AR-15).  While in the presence of CHS-2, **GHAZI** used
his cellular phone to order parts for the two rifles and stated
that he expected to complete the rifles the week of November 2,
2020.

56.  During the meeting, **GHAZI** contacted **SOUSA** and directed
him to join the group at the Magnolia Property.  **SOUSA** arrived
shortly thereafter.  In the presence of CHS-1, CHS-2, **GHAZI**, and
**JARRAH**, **SOUSA** removed a pistol from his waistband, removed the

---

was conducted in Arabic and that recording has not yet been
translated.  Therefore, the facts set forth below regarding the
meeting are based on information provided by CHS-2 shortly after
the meeting concluded, which CHS-1 contemporaneously affirmed.

magazine, and handed the pistol to **GHAZI**.  **GHAZI** then handed the pistol to CHS-2 and told CHS-2 to hand the cash for the pistol directly to **SOUSA**.  CHS-2 handed **SOUSA** $700 for the pistol.

57.  At the conclusion of the meeting, CHS-2 met FBI special agents and provided the FBI the pistol, a 9mm pistol built with parts from Supplier #1.

58.  According to ATF records, **GHAZI, JARRAH, DIAZ**, and **SOUSA** have not applied for or obtained licenses to engage in the business of manufacturing or dealing firearms.

## V.  CONCLUSION

59.  For all of the reasons described above, there is probable cause to believe that **GHAZI**, **JARRAH, SOUSA,** and **DIAZ** have committed a violation of 18 U.S.C. § 371 (Conspiracy to Engage in the Business of Manufacturing Firearms and the Business of Dealing Firearms in violation of 18 U.S.C. § 922(a)).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 9th  day of
November  , 2020.

_____
UNITED STATES MAGISTRATE JUDGE